UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-cv-12305-RGS

GREGORY SMITH

v.

TOWN OF BARNSTABLE et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

April 14, 2021

STEARNS, D.J.

Plaintiff Gregory Smith alleges that he was a victim of unlawful arrest, false imprisonment, malicious prosecution, conspiracy to intimidate a witness, and violations of his right to equal protection and substantive due process. Defendants are the Town of Barnstable, Barnstable Chief of Police Paul McDonald, and four officers employed by the Barnstable Police Department, Spencer Jackson, David Heise, David Myett, and Kevin Tynan (in their official and personal capacities). Smith frames the action on multiple provisions of the Federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985, 1988. Defendants move for summary judgment on all claims. For the following reasons, defendants' motion will be allowed.

## Background

In the light most favorable to Smith, the relevant material facts are as follows. On the evening of November 12, 2016, two 911 calls were placed from Smith's home in Barnstable, Massachusetts, where he lived with his then-girlfriend (now wife) Jacqueline Round and her 7-year-old son. Both calls arose from a domestic quarrel between Smith and Round. Smith made the first 911 call and told the operator that "my girlfriend is going crazy, she's breaking things, she's throwing things, she's out of control." Pl.'s Ex. 3 (Dkt # 80-3) (unofficial transcript). Smith said that there was a knife involved and that he would wait outside for police to arrive. *See id.* The second 911 call came from Round, and was transcribed as follows:

> [Dispatcher:] 911 recorded line, where is your emergency?
> **[Round:] It's at 4005 Main Street.**
>
> And what's going on there?
> **I – my live-in boyfriend, he basically hurts me a lot. My son is here and he dumped out my clothes because he was mad because I moved a box and then he dumped out my clothes and he was attacking me and he was throwing me around the room in front of my 7-year-old son.**
>
> Okay. What's your name?
> **Jaclyn.**
>
> What's your last name, Jaclyn?
> **Round.**
>
> Round?

1

**Yes.**

R-O-U-N-D?
**Yes.**

Ok. And what's his name?
**Gregory Smith.**

Smith?
**Yes.**

Ok. And where is he now?
**He's on the – his sister is on the phone with 911 because he knew as soon as I called he was gonna call–**

Ok
**– and I didn't do anything to him. I specifically wouldn't have called you if – I did nothing wrong. All he's gonna do is send the cops here and he will talk to the cops and make them, like I'm the crazy person. I know he will, I know he will.**

Ok. Where's your other friend?
**It's my little boy – he's standing right next to me.**

Oh, it's your son? I thought you said you had a friend over?
**No – I have no friends over here, it's just my 7-year-old son.**

Ok.
**And he just – started throwing me around the room again.**

[Child in background]: *Can you call Grandma, please?*
**Yes, [Child]. And he's gonna run out to the cops first and then they're – he'll get me arrested because he's threatened that all the time.**

[Dispatcher:] You guys had past problems?
**Yes – we've had past problems.**

2

> Ok.  So he's upstairs and you're downstairs now?
> **No – he just walked outside because the cops are coming and he can talk to them first.**
>
> Ok – stay inside, they're already on their way, ok?  They'll be right over, okay?
> **All right.**
>
> All right, bye.

Defs.' Ex. 4 (Dkt # 77-4) (unofficial transcript).

Spencer Jackson was the first officer to arrive at the scene where he was shortly joined by other officers.[1]  Smith was waiting outside of the house.  Jackson went inside, without asking Smith's permission, to speak with Round, who was waiting downstairs.  In his report, Jackson wrote that Round told him that Smith had "grabbed [her] in a bear hug from the back[,] wrapping his arms around her, picking her up and flinging her around the room."  Pl's Ex. 4 (Dkt # 80-4) at 1.  She also told Jackson that Smith had grabbed her cell phone from her hand to stop her from calling the police, and alleged that Smith had assaulted and choked her on several past occasions.

---

[1] Officers David Heise, David Myett, and Kevin Tynan are identified in the police records as the other officers who were dispatched.  Smith insists that additional officers were present, including a female officer.  *See* Second Am. Compl. (Dkt # 61) ¶ 23 ("He remained there until what he would estimate to be 5 – 8 police officers . . . arrived."); Defs.' Ex. 7 (Dkt # 77-7) (Smith Dep.) at 47-48 ("I would have guessed it was more like six. . . . and I'm reasonably certain that at least one of them is female.").

3

*Id.* Jackson observed red marks on Round's neck, but she denied having been choked during this latest incident.[2] *Id.* After speaking with Round, Jackson returned outside and spoke with Smith, who denied Round's accusations and claimed that he had acted in self-defense. Jackson placed Smith under arrest for Assault and Battery on an Intimate Partner (Mass. Gen. Laws ch. 265, § 13M) and Intimidation of a Witness (Mass. Gen. Laws ch. 268, § 13B).[3]

After Smith's arrest, the officers attempted to persuade Round to seek a Chapter 209A protective order. Jackson is alleged to have told Round that Smith was "extremely dangerous," "the most dangerous person I have encountered in 30 years as a police officer," and would likely "come back and hurt [Round] again." Second Am. Compl. ¶ 114. They also intimated that Round could lose custody of her son if she did not seek court protection. Jackson then told Round to accompany him to the station to make a report. At the station, Jackson presented her with a pre-filled application for a

---

[2] Smith maintains that it is "obvious" from the photos taken at the scene that the redness resulted from her child wrapping his arms around his mother's neck because of his emotional state. Smith Dep. at 62.

[3] The intimidation charge was based on the allegation that Smith tried to grab the phone from Round's hand to prevent her from reporting the incident. *See Commonwealth v. Belle Isle*, 44 Mass. App. Ct. 226, 228-230 (1998). Smith alleges that the felony charge constituted "an undisguised attempt to intimidate [him] into accepting a plea." Second Am. Compl. ¶ 42.

4

Chapter 209A order. She signed it, allegedly because Jackson had "made it implicitly clear that unless she agreed to sign the application, she would need to find her own transportation home from the police station." *Id.* ¶ 115. Round also signed an affidavit in support of the application, repeating the statements she had made to Jackson at the scene. A Barnstable District Court judge entered the Chapter 209A order *ex parte* on November 14, 2016. *See* Defs.' Ex. 16 (Dkt # 77-6).

Criminal charges were initiated against Smith arising from the incident. After the charges were filed, Smith and Round married, and the case was dismissed without prejudice. The notation on the docket read "Defendant and Victim recently married - although not invoked, a marital priv[ilege] exists." Defs.' Ex. 12 (Dkt # 77-12) at 4.

## Discussion

Summary judgment is appropriate when, based upon the pleadings, affidavits, and depositions, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

5

242, 247-248 (1986). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. Puerto Rico Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008).

"[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam), quoting *Anderson*, 477 U.S. at 255. However, the court cannot "draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective." *Pina v. Children's Place*, 740 F.3d 785, 795 (1st Cir. 2014), quoting *Cabán Hernández v. Philip Morris USA, Inc.*, 486 F.3d 1, 8 (1st Cir. 2007).

**Probable Cause for Arrest**

Smith's false arrest and false imprisonment claims hinge on the assertion that he was arrested without probable cause. "There is no cause of action for false arrest under § 1983 unless the arresting officer lacked probable cause." *Street v. Surdyka*, 492 F.2d 368, 372-373 (4th Cir. 1974); *see also Floyd v. Farrell*, 765 F.2d 1, 5 (1st Cir. 1985) (same). The probable cause analysis entails "'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken."

6

*Maryland v. Macon*, 472 U.S. 463, 470-471 (1985), quoting *Scott v. United States*, 436 U.S. 128, 136 (1978). Thus, a pretextual arrest, if supported by probable cause, will not support a claim of false arrest. *See Holland v. Portland, Maine*, 102 F.3d 6, 10 (1st Cir. 1996). Similarly, so long as probable cause exists justifying an arrest for some offense, it is of no consequence that the basis stated by the arresting officer is legally invalid. *See Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (rejecting a rule requiring that the offense for which the arrest is ostensibly made be "closely related" to the offense for which probable cause exists).

"When the constitutional validity of an arrest is challenged, it is the function of a court to determine whether the facts available to the officers at the moment of the arrest would 'warrant a man of reasonable caution in the belief' that an offense has been committed." *Beck v. Ohio,* 379 U.S. 89, 96 (1964) (citation omitted). "The only relevant facts are those known [or imputed] to the officer. When these facts are in reasonable dispute, the fact-finder must resolve the dispute. . . . However, when the underlying facts claimed to support probable cause are not in dispute, whether those 'raw facts' constitute probable cause is an issue of law . . . ." *Holder v. Town of Sandown*, 585 F.3d 500, 504 (1st Cir. 2009) (internal citation omitted).

7

In assessing probable cause in the context of an arrest, a reviewing court is to avoid viewing each of the subsidiary facts "in isolation, rather than as a factor in the totality of the circumstances"; nor may the court dismiss outright any circumstances "susceptible of innocent explanation." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) (lower court erred by ignoring "the whole picture" and instead taking the facts "one by one" while drawing every inference against the arresting officers). A reasonable officer in Jackson's position would have been justified in believing that he had probable cause to arrest Smith based on Round's spontaneous complaint of having been assaulted by Smith during her call to the 911 dispatcher, her repetition of the assault allegations when queried shortly thereafter by Jackson on the scene, the signs of what appeared to be choking bruises on her neck, and Smith's claim to having acted in self-defense.

Smith contends that Round's statements to Jackson were inadmissible hearsay and therefore cannot be properly considered on a motion for summary judgment. This argument confuses the civil brevis standard with the separate legal determination of an officer's probable cause to make a criminal arrest. It has long been the rule in criminal law that probable cause may be based solely on hearsay information that may not be itself admissible at trial. *See Draper v. United States*, 358 U.S. 307, 311-312 (1959); *see also*

8

*Acosta v. Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004) ("The uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause."). Here, of course, the information available to Jackson also included a substantial tranche of non-hearsay – Round's spontaneous utterances in the 911 call, *see United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002), the percipient observations of the bruises to her neck, and Smith's admission against interest. Smith's contention that Jackson should have further investigated the truth of Round's accusations before arresting him is equally unavailing. *See Acosta*, 386 F.3d at 11 ("[O]nce a law enforcement officer unearths sufficient facts to establish probable cause, she has no constitutional duty either to explore the possibility that exculpatory evidence may exist or to conduct any further investigation in the hope of finding such evidence").[4]

---

[4] Smith's claim that his allegations against Round gave Jackson probable cause to arrest her as well is irrelevant. Smith has no standing to assert Round's right to be arrested, if such a right exists. Assuming that Smith is correct that Round was not arrested in part because of the presumption against "dual arrest" established by the Massachusetts Domestic Abuse Law, Mass. Gen. Laws. ch. 209A, § 6, his argument that the law violates equal protection by discriminating against men is invalid on its face. In forbidding officers from arresting both the complainant and the accused abuser as a means "of discouraging requests for law enforcement intervention" the law makes no distinction between female and male complainants. *Id.*

**Entry into the Home**

Smith alleges that Jackson violated his constitutional rights by entering the home that he shared with Round "without asking for or receiving permission to do so, and in the absence of any exigent circumstances which would have permitted them to make a warrantless entry." Second Am. Compl. ¶ 133. The claim fails for two reasons. In the first instance, by virtue of her summoning police assistance, Round gave implicit consent to the warrantless entry of the home she shared with Smith. *See Brown v. State*, 856 S.W.2d 177, 182 (Tex. Crim. App. 1993); *see also United States v. Matlock*, 415 U.S. 164, 171 (1974).

It is true, as the Supreme Court held in *Georgia v. Randolph*, 547 U.S. 103 (2006), that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by *a physically present* resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id*. at 120 (emphasis added). For the exception to apply, an objector need be both physically present and must *expressly* refuse to consent to the warrantless search. *See Glenn v. Commonwealth*, 654 S.E.2d 910, 917 (Va. 2008) (defendant raised no objection despite being in conversation with police before and during the search); *United States v. Amratiel*, 622 F.3d 914, 917 (8th Cir. 2010) (defendant failed to object even

10

though officers took the keys to the gun safe that he shared with his wife from his pocket); *United States v. Moore*, 770 F.3d 809, 813 (9th Cir. 2014) (defendant left it to his fiancé to deal unilaterally with police). While Smith was present, he did not object to the officers' search of the home.[5]

The claim fails in the second instance because it has long been the rule in state and federal law that police responding to an emergency do not require probable cause to make a warrantless entry of a home to render emergency assistance. *See Commonwealth v. Entwistle*, 463 Mass. 205, 214 (2012) ("It suffices that there are objectively reasonable grounds to believe that emergency aid might be needed. . . . [P]olice [do not] need probable cause to believe that a crime has been committed."). "When police cross a threshold not in their criminal investigatory capacity but as part of their community caretaking function, it is clear that the standard for assessing the Fourth Amendment propriety of such conduct is whether they possessed a reasonable basis for doing what they did." *State v. Alexander*, 721 A.2d 275, 284-285 (Md. Ct. Spec. App. 1998); *see also Sutterfield v. City of Milwaukee*, 751 F.3d 542, 558 (7th Cir. 2014) (same); *Hill v. Walsh*, 884 F.3d 16, 19 (1st Cir. 2018) (same); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 400 (2006)

---

[5] Officers have no duty "to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Id.* at 122.

("[O]fficers are allowed to enter a home without a warrant if they reasonably believe that immediate entry is necessary to protect themselves or others from serious harm, even if the officers lack probable cause to believe that a crime has been, or is about to be committed"); *Ryburn v. Huff*, 565 U.S. 469, 474-475 (2012) (same, having threatened a school shooting, officers reasonably believed that pupil might have firearms hidden in his family home); *People v. Strimple*, 267 P.3d 1219, 1224-1225 (Colo. 2012) (*en banc*) (warrantless entry justified by a fear of an imminently violent climax to an escalating domestic dispute).

**Municipal Liability; Civil Conspiracy**

Smith asserts claims of municipal liability against the Town of Barnstable and former Chief of Police Paul McDonald. A § 1983 claim of municipal liability "requires two basic elements: first, that plaintiff's harm was caused by a constitutional violation, and second, that the City be responsible for that violation." *Young v. City of Providence ex rel. Napolitano*, 404 F.3d 4, 25-26 (1st Cir. 2005). A violation of a "right" that is not "secured" by federal law is not actionable under § 1983. *See Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989). As the record does not support any reasonable inference that would establish that the officers violated Smith's constitutional rights, it follows that there can be no

12

municipal liability.  Similarly, to sustain a civil conspiracy claim against the arresting officers under § 1983, Smith would have to prove both "a conspiratorial agreement" and "an actual abridgement of some federally-secured right."  *Nieves v. McSweeney*, 241 F.3d 46, 53 (1st Cir. 2001).  Even assuming the first element (which is dubious), the second element fails for want of a constitutional wrong.[6]

## ORDER

For the forgoing reasons, the motion for summary judgment on all claims is ALLOWED.  The Clerk will enter judgment for defendants and close the case.

---

[6] The court's earlier determination that police had probable cause to arrest Smith also precludes his claim of malicious prosecution.  To make out the elements of a such a claim, Smith would have to establish that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor."  *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013).  All else aside, Smith cannot clear the second hurdle of his prima facie case.  For the same reason, Smith's allegations that the officers knew or should have known from evidence available to them that he was innocent of any criminal wrongdoing, and that, aware of this mistake, sought to cover things up by obtaining a "false conviction against the Plaintiff" and worked "maliciously to actively support a false prosecution" collapses out of the gate.  Second Am. Compl. ¶ 128.  Finally, Smith's complaint that police withheld exculpatory evidence in violation of *Brady v Maryland*, 373 U.S. 83 (1963), is obviated by the fact that any potential criminal prosecution was aborted by the dismissal of the charges against him.

13

SO ORDERED.

/s/Richard G. Stearns
UNITED STATES DISTRICT JUDGE